[No. 1654-2.    Division Two.    January 20, 1976.]

THE STATE OF WASHINGTON, *Respondent*, v. EUGENE CURRY, *Appellant.*

*George W. Dixon* and *James W. Caraher*, for appellant.

*Donald F. Herron, Prosecuting Attorney,* and *Joseph D. Mladinov, Special Counsel,* for respondent.

REED, J.—Defendant Eugene Curry was convicted by a jury of illegal possession of a controlled substance. His appeal from that conviction raises the following issues:

1. Was the defendant denied a speedy trial as defined by CrR 3.3?

2. Did the State demonstrate a sufficient "chain of cus-

tody" to justify the admission of the substance in question into evidence?

3. Was defendant prejudiced by consolidation of counts 1 and 2 of the information?

4. Did the State produce sufficient evidence to establish that the substances in question were controlled substances proscribed by RCW 69.50.010 *et seq.*?

We resolve each issue in favor of the State and therefore affirm the conviction.

## SPEEDY TRIAL

Defendant's arrest on the present charge followed a shakedown search of his cell in the Pierce County jail where he was being held pending appeal of an earlier conviction. Defendant had been in custody in Pierce County for 4 months prior to his arrest on the instant charge and remained in custody at all times here pertinent. His first preliminary appearance was his arraignment on July 29, 1974. His trial began on October 28, 1974, the 92d calendar day following his first preliminary appearance.[1] On the day of trial, October 28, defendant's counsel moved to dismiss the charge for failure to comply with the 60-day speedy trial provision of CrR 3.3(c). The motion was denied and defendant was tried and convicted of one count of possession of a controlled substance.

Defendant asserts that because he was "unable to obtain pretrial release" he should have been brought to trial within 60 days of his preliminary appearance as required by CrR 3.3(c). We do not agree. In *State v. Keith*, 86 Wn.2d 229, 232, 543 P.2d 235 (1975), our Supreme Court explained that the purpose of the 60-day rule is to

give persons taken from freedom (freedom in the legal sense, . . .) precedence on the criminal docket over persons released on bail or otherwise legally at large. The appellants would not have been free after recapture re-

---

[1] Over the course of the 92 calendar days between defendant's preliminary appearance and trial, defendant changed counsel on three separate occasions. His second counsel successfully moved for a 7-day continuance after trial had been set for September 23. However, we do not base our decision on the delay occasioned by the numerous counsel changes nor on the delay granted on defendant's own motion.

gardless of their being charged with the crime of escape. The defendant's status here is indistinguishable from that of the escapees in *Keith*. As the court explained in *Keith*, at page 231:

Legally, the inmate, *whether in the cell* or beyond the wall, retains his status as "inmate" until that status has been legally terminated.

(Italics ours.) In the case at bench the defendant was legally in custody at the time of his arrest and remained so at all times until his trial. Accordingly, he was not deprived of his liberty for purposes of the speedy trial rule as a result of that arrest. This court said in *State v. O'Neil*, 14 Wn. App. 175, 540 P.2d 478 (1975) at 176:

That rule [CrR 3.3(c)] refers to the ability to obtain pretrial release because of the pendency of the *current* criminal charges and is not invoked because of an inability to obtain release due to other matters.

We hold, therefore, that defendant's trial, within 90 legal days[2] of his preliminary appearance, satisfied the speedy trial rule of CrR 3.3(b).

## CHAIN OF CUSTODY

As previously noted, defendant was arrested following a shakedown search of his cell by three jail security officers for suspected drugs. We feel it is unnecessary to relate in detail the testimony elicited at trial from the officers concerning the seizure and subsequent handling of the substances in question. It is sufficient to state that there were certain inconsistencies in the officers' testimony. These discrepancies included different versions of where defendant was standing when the substances were seized, exactly where the substances were found, who carried the substances to the central desk for marking, and of the type of packaging and actual appearance of the substances. Despite these discrepancies, all officers who testified regarding the seizure of the drugs agreed that they were taken from the

---

[2]Applying the computation of time provisions of CR 6 as directed by CrR 8.1, the day of the defendant's preliminary appearance and the day before the commencement of the trial, a Sunday, are not counted in computing the 90-day limitation of CrR 3.3(b).

defendant. In addition, the officer who actually seized the substances from the defendant testified that the packet introduced at trial containing the alleged controlled substances (a greenish-colored powder) was the same packet which he had taken from the defendant on the day in question.

The general rule concerning the admissibility of exhibits was enunciated by our Supreme Court in *Allen v. Porter*, 19 Wn.2d 503, 508, 143 P.2d 328 (1943):

> An exhibit is admissible, so far as identity is concerned, when it has been identified as being the same object about which the testimony was given and when it is stated to be in the same condition as at the time of the occurrence in question.

This rule was cited with approval in *State v. Russell*, 70 Wn.2d 552, 424 P.2d 639 (1967). We conclude that the test enunciated by the court in *Allen v. Porter, supra,* was met here. The discrepancies in the testimony of the various officers go to the weight to be afforded the evidence by the trier of fact. *See State v. Music*, 79 Wn.2d 699, 712, 489 P.2d 159 (1971). The substances were properly admitted.

CONSOLIDATION OF COUNTS 1 AND 2

The State initially charged the defendant with two counts of possession of a controlled substance. Count 1 charged possession of "D-Amphetamine Sulphate" and count 2 charged possession of "Amobarbital Sodium." It was developed at trial through the testimony of the State's chemical expert, Dr. Eagleson, that the counts of possession of the two chemical compounds were based upon a breakdown of a single substance. The defendant moved to consolidate the two counts into one, asserting that it was unfair to subject him to possible conviction of two counts for committing a single act. The trial court agreed and ordered consolidation, whereupon the information was deemed amended to charge that the defendant was in possession of a controlled substance consisting of a combination of d-amphetamine and amobarbital sodium. Defendant now contends, for the first time on appeal, that he was prejudiced

by the consolidation in that he was "denied the right to take issue with the State's proof," or lack thereof, that each individual chemical compound identified by the State's expert was one proscribed by RCW 69.50.010 *et seq.* We cannot accept this argument. The consolidation was ordered on defendant's own motion and he cannot now be heard to complain. *State v. Grant,* 9 Wn. App. 260, 267, 511 P.2d 1013 (1973).

### SUFFICIENCY OF THE EVIDENCE

■ Defendant finally challenges the sufficiency of the State's proof that the substance found on the defendant contained controlled substances as defined by RCW 69.50.010 *et seq.* We agree that the State failed in its proof that "Amobarbital Sodium" is a controlled substance under the act. The testimony of Dr. Eagleson in this regard was as follows:

Q [By prosecutor] Based upon those seven tests, then did you form an opinion as to the chemical make-up of the green powder in Plaintiff's Exhibit No. 2?

A [Dr. Eagleson] Yes.

Q And what is your opinion as to the chemical make-up?

A It is a combined barbiturate-amphetamine, probably —well, obviously, it's been crushed up from it.

. . .

Q All right, and what is the other side then called?

A It is sodium amobarbital, 30 milligrams.

. . .

Q And, again, is this amobarbital sodium, is that in the class of barbituric acid?

A Yes, it is.

The above testimony is the totality of the proof offered to establish that amobarbital sodium is a controlled substance under RCW 69.50.208 (Schedule III), which reads in relevant part:

(c) . . . any material, compound, mixture, or preparation which contains any quantity of the following substances . . .

(1) . . . any quantity of *a derivative of barbituric acid,* . . .

(Italics ours.) We are unwilling to conclude that a substance which is "in the class of barbituric acid" is equivalent to a "derivative of barbituric acid." Neither this court nor the trial court is permitted to take judicial notice of such a technical conclusion. The State relies on *State v. Waggoner*, 80 Wn.2d 7, 490 P.2d 1308 (1971) in arguing that the above testimony was sufficient. The court in *Waggoner* stated at page 12:

> In proscribing the use or sale of lysergic acid or its derivatives *the legislature clearly intended its prohibition to apply to LSD.* Lysergic acid itself is a non-hallucinogenic substance. Furthermore, LSD is the only known derivative of lysergic acid which is hallucinogenic, and produces bizarre visions and delusions in the minds of users. We could be rightfully accused of succumbing to similar delusions were we to fail to hold as a matter of law that the legislature intended to prohibit the sale or use of LSD when it passed RCW 69.40.060.

(Italics ours.) The legislative intent is not so clear in the instant case. "Amobarbital Sodium" is not a drug which has received the dubious reputation or extensive public recognition of LSD. Accordingly, we are unwilling to apply the *Waggoner* rationale to the instant case and hold that the State's proof was insufficient as to "Amobarbital Sodium." However, we conclude that the failure of proof was harmless error in light of the sufficiency of the evidence to establish that "D-Amphetamine Sulphate" is a controlled substance under the act.

As previously quoted, Dr. Eagleson testified that the substance possessed by the defendant was a *"combined* barbiturate-*amphetamine."* (Italics ours.) He went on to identify one chemical side (the barbiturate) as amobarbital sodium, and the other as d-amphetamine sulphate. RCW 69.50.208 (Schedule III) proscribes the possession of:

> (b) Any material, compound, mixture, or preparation which contains any quantity of the following substances . . .
>
> (1) *Amphetamine, . . .*

(Italics ours.) Dr. Eagleson's testimony therefore estab-

lished a prima facie case of possession of amphetamine, a substance specifically proscribed in Schedule III. The jury was instructed that they could convict if they found:

(1) That the defendant EUGENE CURRY unlawfully possessed a controlled substance;

. . .

(3) That the controlled substance so possessed was a combination of D-Amphetamine (sulphate) and Amobarbital Sodium;

(Instruction 13.) Having returned a guilty verdict after being so instructed, the jury necessarily concluded that defendant possessed *both* "Amobarbital Sodium" and "D-Amphetamine Sulphate," the latter of which is a controlled substance.

Judgment affirmed.

PETRIE, C.J., and PEARSON, J., concur.