[No. 8300–7–I.   Division One.   April 13, 1981.]

THE STATE OF WASHINGTON, *Respondent,* v. JOSEPH
EDWARD SCHAPIRO, *Appellant.*

*Stroh & Funk, P.S., Inc.,* and *James J. Lamont,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Troy Yancey, Deputy,* for respondent.

DURHAM, J.—Joseph E. Schapiro appeals his conviction of first degree theft and unlawful issuance of checks or drafts. In 1978, Schapiro opened a retail dairy products store in Seattle and decided to establish a franchise for Haagen–Dazs ice cream of St. Louis, Missouri. He estimated that he would need approximately $50,000 for this venture. An attorney friend introduced Schapiro to Michael Rosen, another attorney, who introduced him to Kent Adamson. Adamson agreed to the proposal and invested $50,000 in November 1978. A new business, Island Monarch, Ltd., was established to facilitate the business, and a checking account was opened under that name at Rainier Bank. Schapiro, Adamson, and Rosen were the only persons authorized to write checks on the Island Monarch, Ltd., account.

By November and December 1978, some $30,000 had disappeared from the Island Monarch, Ltd., account. According to Schapiro, the money was taken by his nephew, who worked at Schapiro's Seattle store, and used to buy cocaine. Schapiro testified that Adamson had authorized the nephew to purchase cocaine with Island Monarch funds, sell the cocaine and redeposit the money. Nothing was ever redeposited. Adamson denied this arrangement and testified that either Schapiro or the nephew had stolen the money.

On January 18, 1979, Schapiro withdrew $15,000, leaving

about $2,000 in the account. The record reflects conflicting testimony as to the ensuing events. Schapiro stated that he believed that the Island Monarch, Ltd., account remained open through April 1979. He testified that Adamson telephoned him from Alaska about April 1, 1979, and told him that all the money had been recovered from the nephew and that soon plans could continue for the Haagen–Dazs franchise. Adamson then instructed Schapiro to purchase various items of camera and stereo equipment, marine supplies, jewelry, and clothing for him, using the Island Monarch, Ltd., account. Schapiro purchased the merchandise, $30,000 worth, using checks drawn on the account, on April 7 and 8, a Saturday and Sunday, and took it home. The checks were all dishonored.

Adamson's version differs considerably. He denied ever calling Schapiro from Alaska. He testified that he closed the Island Monarch, Ltd., account on February 16, 1979. On that day or the next he telephoned Schapiro and told him that the account was closed. Rosen was with Adamson during this conversation and testified that Adamson did not say that the account was closed, but rather that there was no money in the account. The branch manager of Rainier Bank testified that the account was closed on February 16, 1979. Statements for November and December 1978 were mailed to Rosen's downtown office. However, Schapiro arranged for the January and February 1979 statements to be sent to his home. The statement dated February 16, 1979 indicated that the balance of the Island Monarch, Ltd., account was zero.

Schapiro was arrested on April 16, 1979 and released the following day. On June 18, 1979, he was charged with first degree theft in Seattle District Court. His preliminary hearing began on July 13, 1979 and was continued to July 20 and July 27 for further testimony and additional investigation. The case was bound over to superior court on July 27, 1979. Prior to trial, Schapiro filed a motion for dismissal on the basis of violation of the speedy trial rule, which was denied. Trial commenced on October 22 and Schapiro stip-

ulated to all elements of the crimes charged except the intent to defraud.

During trial, all witnesses were excluded from the courtroom. In the course of the proceedings it was discovered that a friend of Adamson was recording the trial with a tape recorder. Adamson testified that he had asked her to do this, but did not know that there was anything wrong with it and that he wanted the tape out of curiosity. At the time the tape was made, Adamson had already completed his testimony in the case.

·The court found Schapiro guilty of the charges. Schapiro cites three general assignments of error: (1) denial of his right to a speedy trial, (2) failure of the trial court to exclude Adamson's testimony or to dismiss the case for violation of the witness exclusionary rule due to the tape recording, and (3) failure to dismiss based on insufficiency of the evidence.

■ We will first address the speedy trial issue. Schapiro has shown no prejudice resulting from the 6–month delay between his arrest and trial, and he therefore has no valid constitutional claim of a violation of his right to a speedy trial. *Barker v. Wingo,* 407 U.S. 514, 33 L. Ed. 2d 101, 92 S. Ct. 2182 (1972); *United States v. Marion,* 404 U.S. 307, 30 L. Ed. 2d 468, 92 S. Ct. 455 (1971). His speedy trial argument must be based on a violation of CrR 3.3. Such a violation would require dismissal with prejudice, CrR 3.3(i), and thus, eliminate the need to consider the other issues.

Former CrR 3.3(b)(1) (adopted November 17, 1978) provided that the 90–day period applicable to defendants not held in custody

> shall commence to run from the date: (a) of the order binding the defendant over to the superior court following a preliminary hearing pursuant to JCrR 2.03 or (b) of the tenth day following the defendant's arrest in the event a preliminary hearing is not held or the charge is initially filed in the superior court.

Schapiro argues that his case must be dismissed because *State v. Edwards,* 94 Wn.2d 208, 616 P.2d 620 (1980),

interpreting this language, requires that a defendant be bound over to superior court within 100 days of arrest. The time between Schapiro's arrest and bindover was 102 days.

The State notes that *Edwards* was decided after the relevant events in this case transpired, and urges us to give *Edwards* prospective effect only. It cites *State v. Barton,* 93 Wn.2d 615, 611 P.2d 789 (1980), which applied prospectively the rule of *State v. Aleshire,* 89 Wn.2d 67, 568 P.2d 799 (1977), relating to the time within which a retrial must be had following a mistrial. The *Barton* court found that this rule was a "newly adopted procedural rule", not an interpretation of an existing rule, and would, therefore, be prospective in nature. *Barton,* at 617.

In *Edwards* we find the reverse. It is true that the *Barton* court paid particular attention to whether the *Aleshire* rule could have been anticipated in deciding whether that rule was "newly adopted" or a construction of an existing rule. Although no one could reasonably have anticipated *Edwards,* the rule announced in that case seems to be nothing more than an interpretation of an existing rule, the former CrR 3.3.

The effect of the Supreme Court's construction of a statute has been described as follows:

> It is a fundamental rule of statutory construction that once a statute has been construed by the highest court of the state, that construction operates as if it were originally written into it. In other words, there is no "retroactive" effect of the court's construction of a statute; rather, once the court has determined the meaning, *that is what the statute has meant since its enactment.*

(Citations omitted.) *Johnson v. Morris,* 87 Wn.2d 922, 927–28, 557 P.2d 1299 (1976). Rules of court should generally be construed in the same manner as statutes. *State v. McIntyre,* 92 Wn.2d 620, 600 P.2d 1009 (1979). Thus, the rule in *Edwards* applies to cases tried before that decision was announced, including the present case.

However, application of the *Edwards* holding to the facts here exposes an ambiguity in that decision. In

*Edwards* both the preliminary hearing and bindover occurred long after the critical 100–day deadline. Schapiro's preliminary hearing began on July 13, 1979, only 88 days after his arrest, and was continued to two later dates. It ended, and he was bound over, on July 27, 1979, 102 days following arrest. Unfortunately, the *Edwards* opinion refers to "preliminary hearing" and "bindover" interchangeably, without distinguishing the two events. For example, the opinion frames the issue of the case as "whether the possibility of timely trial irrevocably 'expires' if a preliminary hearing is not held within 100 days of defendant's arrest . . ." *Edwards,* at 210. Yet the court later speaks of "bindover" as the event which would "serve to postpone untimeliness." (Italics omitted.) *Edwards,* at 212. This provides little guidance in those cases where the preliminary hearing and the bindover fall on separate dates, or where the hearing begins within the 100–day period but is concluded after the deadline.

We conclude that the preliminary hearing is the event required to transpire by *Edwards,* and that a preliminary hearing begun within the 100–day period following arrest will satisfy the rule, even if that hearing is not concluded until afterwards. Several reasons support this result. First, other portions of CrR 3.3 that speak of triggering events do so in terms of the commencement of the event. For example, a defendant must be "brought to trial" within a certain time period. CrR 3.3(b)(2)(3). The rule does not require that the defendant's trial be concluded within the limits set by the rule, but rather that the trial begin within the 60 or 90 days. *See State v. Aleshire, supra; People v. Amati,* 63 Cal. App. 3d Supp. 10, 134 Cal. Rptr. 61 (1976).

Second, preliminary hearings and bindovers frequently do not occur on the same day, and in fact could be weeks apart, as in this case. The preliminary hearing is a significant step in the determination of probable cause to bind the defendant over to superior court and must not be

hurried.[1] It would frustrate justice to rush the district court in its determination of probable cause where the facts of a particular case are so complex as to require a second, third or more preliminary hearings. The instant case appears to be precisely of such complexity. To ask the judge to determine bindover on the basis of one preliminary hearing in such a case would be unrealistic. It would also be disadvantageous to both the prosecution and the defendant who benefit equally from a full investigation and consideration of the facts of each case prior to bindover. *See Summers v. Rhay,* 67 Wn.2d 898, 900, 410 P.2d 608, *cert. denied,* 384 U.S. 944, 16 L. Ed. 2d 543, 86 S. Ct. 1473 (1966). The period between preliminary hearing and bindover is also critical for decisions such as plea bargaining or reduction of charges, and thus, can inure to the benefit of the defendant.

Third, if a district court judge were to deny the State's motion to bindover, the prosecution may appeal that decision by filing a motion in superior court to set aside the findings. JCrR 2.03(d)(5). This would create another gap in the process that is unaccounted for in the speedy trial requirements if we use the bindover date rather than the preliminary hearing date to satisfy the *Edwards* rule.

---

[1]We recognize that the Supreme Court in *State v. Edwards,* 94 Wn.2d 208, 616 P.2d 620 (1980), in dicta, referred to the preliminary hearing as having

no independent significance if the defendant was arrested earlier.

The probable cause question considered at the preliminary hearing has already been addressed if the defendant was arrested.

*Edwards,* at 214. Whereas in many cases the preliminary hearing may be little more than a formality, it is not difficult to imagine cases where the probable cause determination at that stage would have great significance by itself. One of the purposes for holding a preliminary hearing prior to bindover to superior court is

to determine whether there is probable cause to believe that the defendant has committed a felony.

JCrR 2.03(d)(1); *State v. Jackson,* 66 Wn.2d 24, 400 P.2d 774 (1965). The preliminary hearing also serves other purposes. The comments by the Washington Criminal Rules Task Force which proposed the current version of JCrR 2.03 make clear that the preliminary hearing is intended as a discovery tool and to "serve as a check on the discretion of the prosecution." Criminal Rules Task Force, *Washington Proposed Rules of Criminal Procedure* 152 (West Pub. Co. ed. 1971).

Applying the foregoing principles to the facts of this case, we find no violation of the speedy trial rule. Schapiro's preliminary hearing began on July 13, 1979, 88 days after his arrest. His trial commenced on October 22, 1979, 87 days after his bindover to superior court on July 27. The trial court properly denied his motion to dismiss.

■ Notwithstanding our analysis above, the circumstances of this case do not present an appropriate situation for dismissal of the charges. The record from the district court proceedings, albeit limited, discloses Schapiro's concurrence, if not his instigation, in the continuances of the preliminary hearing proceedings. The deputy prosecuting attorney's argument before the trial court on the motion to dismiss, unrefuted by defense counsel, contained in part:

> I would point out that the continuances in this matter were granted at the defendant's request. In fact, they were all to Mr. Schapiro's benefit. At that time he had provided some information that the police agencies were checking out to see if perhaps it could lead to a dismissal of this action.

The district court docket sheet in fact reflects the testimony of additional witnesses at the later hearings. In similar circumstances, we have held that a defendant cannot complain of court action when he requested such action. *State v. Hood,* 24 Wn. App. 155, 600 P.2d 636 (1979); *State v. Curry,* 14 Wn. App. 775, 545 P.2d 1214 (1976). Schapiro's acquiescence regarding the continuances should waive any speedy trial rule violation. *See State v. Parker,* 116 Ariz. 3, 567 P.2d 319 (1977).

Schapiro next assigns error to the trial court's failure to exclude Adamson's testimony or to dismiss the case on its own motion for violation of the witness exclusionary rule due to the tape recording. These motions were not made by Schapiro at trial.

■ Questions concerning the exclusion of witnesses and the violation of that rule are within the broad discretion of the trial court and will not be disturbed, absent manifest abuse of discretion. *State v. Walker,* 19 Wn. App. 881, 578

P.2d 83 (1977); *State v. Bergen,* 13 Wn. App. 974, 538 P.2d 533 (1975). The defense here had adequate opportunity to question both Adamson and his friend whom he had directed to make the recording. Significantly, the recording was made after Adamson had finished testifying. Thus, he could not have intended to use it to modify his own testimony. We find no abuse of discretion in the court's failure to strike his testimony or to dismiss the case.

██ Schapiro's final assignment of error challenges the sufficiency of the evidence. Our inquiry at this point is if

> after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

*Jackson v. Virginia,* 443 U.S. 307, 319, 61 L. Ed. 2d 560, 99 S. Ct. 2781 (1979); *accord, State v. Green,* 94 Wn.2d 216, 616 P.2d 628 (1980). This test compels the conclusion that in the case at hand any rational trier of fact could have found that Schapiro knew that the Island Monarch, Ltd., account was closed when he purchased the merchandise in April 1979. Knowledge that the account was closed, or intent to defraud, was the only issue at trial. The prosecution introduced sufficient evidence to prove Schapiro's knowledge beyond a reasonable doubt. The conflict in testimony was a matter for the trial court to resolve. This court will not substitute its judgment for that of the trier of fact upon a disputed issue of fact. *Udhus v. Peglow,* 55 Wn.2d 846, 350 P.2d 640 (1960); *Keogan v. Holy Family Hosp.,* 22 Wn. App. 366, 589 P.2d 310 (1979).

The judgment of the trial court is affirmed.

SWANSON and ANDERSEN, JJ., concur.