[No. 66708-4-I.   Division One.   January 14, 2013.]

THE STATE OF WASHINGTON, *Respondent*, v. JORGE PEÑA
FUENTES, *Appellant*.

756

*Richard A. Hansen* (of *Allen Hansen & Maybrown PS*), for appellant.

*Daniel T. Satterberg, Prosecuting Attorney*, and *Brian M. McDonald, Deputy*, for respondent.

*Sherilyn C. Peterson, Mary Katherine Young High*, and *Sheryl Gordon McCloud* on behalf of Washington Association of Criminal Defense Lawyers, amicus curiae.

¶1 ELLINGTON, J.* — The purposeful and unjustified invasion of attorney-client communication by law enforcement is inexcusable. In this case, a detective listened to several recorded telephone calls between the defendant and his attorney. This is plainly egregious misconduct and gives rise to a presumption of prejudice.

¶2 The misconduct occurred at the point of a motion for new trial, so it had no effect on the fairness of the trial itself, and the trial court expressly found the misconduct had no effect upon the resolution of the motion for a new trial. The detective's astonishing behavior thus had no effect on Jorge Peña Fuentes' convictions for child rape and child molestation.

¶3 In these unusual circumstances, the presumption of prejudice was rebutted. The trial court did not abuse its discretion in allowing the convictions to stand.

¶4 We reject Peña Fuentes' remaining arguments. The court erred in dismissing the child rape conviction on double jeopardy grounds, and we remand for resentencing. Otherwise, we affirm.

## BACKGROUND

¶5 The State charged Peña Fuentes with one count of first degree rape of a child, three counts of first degree child molestation, and three counts of second degree child molestation. The relevant facts are as follows.

¶6 J.B. was born in 1993 to Mirna Corona and her then husband, Brian Bean. After Bean and Corona separated,

---

* Judge Ellington is serving as a judge pro tempore of the Court of Appeals pursuant to RCW 2.06.150.

Corona began living with Peña Fuentes. Their daughter L.P. was born in 1998. Corona and Peña Fuentes were married the following year. But their relationship was volatile; they separated in 2004 and later divorced. J.B. and L.P. lived with Corona, but Peña Fuentes continued to care for both girls after school. Peña Fuentes met his current wife, Mihaela Peña, in 2007.

¶7 In November 2008, when J.B. was in ninth grade, she disclosed to her school counselor that Peña Fuentes had sexually abused her from third through sixth grades. After talking to the school counselor, J.B. told her cousin that Peña Fuentes put his fingers in her vagina and engaged in oral sex.[1] She also told her best friend that Peña Fuentes "touched her with his fingers in a very inappropriate place."[2]

¶8 The counselor contacted the police, Child Protective Services, and Corona. Detective Casey Johnson was assigned to the case. Peña Fuentes admitted to Detective Johnson that he was physically playful with his children, frequently biting J.B. in various places, including her bottom. He said he may have grabbed her breast unintentionally but denied that he ever engaged in oral sex with J.B. or penetrated her with his fingers. Peña Fuentes was not immediately charged.

¶9 In October 2009, Child Protective Services removed L.P. from Corona's home and placed her with Mihaela Peña's parents.[3] On October 12, the prosecutor informed Peña Fuentes that charges had been filed. On October 21, L.P. sent a handwritten letter to the prosecutor's office, claiming she knew the abuse allegations were not true because she heard Corona tell J.B. "to lie and say that my

---

[1] J.B. had made previous equivocal disclosures to the cousin.

[2] Report of Proceedings (RP) (Oct. 21, 2010) at 269.

[3] The reasons for this were apparently unrelated.

dad sexually abused her."[4] This letter started the chain of events that concerns us here.

¶10 L.P. testified at trial. She was then 12 years old. She testified she did not remember whether J.B. ever told her the allegations were untrue. The defense offered her letter into evidence. The court admitted the letter as exhibit 2 and allowed counsel to read it to the jury.

¶11 On redirect, L.P. testified she wrote the letter because she was afraid for her father and wanted to help him. She admitted telling the prosecutor that her stepmother said she should write the letter and that her father, stepmother, and stepmother's parents were in the house when she wrote it. She could not recall who provided the prosecutor's address or the envelope on which to write it.

¶12 The court later instructed the jury that "[e]xhibit 2 may only be considered by you for any bearing it may have in assessing [L.P.'s] credibility. You may not consider [e]xhibit 2 for the truth of the matter asserted within it."[5] Peña Fuentes made no objection.

¶13 The jury convicted Peña Fuentes of one count of rape of a child in the first degree and two counts of first degree child molestation. It acquitted him of one count of first degree child molestation and did not reach a verdict on the second degree molestation counts.

¶14 Peña Fuentes moved for a new trial, alleging the convictions for both child rape and child molestation violated double jeopardy.

¶15 Meanwhile, Mihaela Peña and her brother confronted L.P. at her church. They were carrying video equipment, and they asked L.P. to record a statement reiterating that she knew the allegations against her father were false. She complied.

¶16 With the assistance of new counsel, Peña Fuentes submitted the video as additional grounds for a new trial.

---

[4] RP (Oct. 21, 2010) at 296.

[5] RP (Oct. 26, 2010) at 533.

He argued the video constituted newly discovered evidence. He also argued that L.P.'s lack of recall at trial regarding the events described in her pretrial letter constituted "[a]ccident or surprise" for purposes of CrR 7.5(a)(4), and that a new trial was required because the court committed an error of law by admitting L.P.'s pretrial letter only for impeachment.

¶17 Concerned about the circumstances of the video, the prosecutor asked Detective Johnson to investigate possible witness tampering charges. Specifically, the prosecutor asked him to obtain the recordings of Peña Fuentes' phone calls from the jail. By great misfortune, the recordings provided by the jail to the detective included calls between Peña Fuentes and his attorney, Richard Hansen.

¶18 Two days later, L.P. signed a declaration prepared by the prosecutor in which she recanted her statements in the video: "[A]ll the things I had said in that video were lies."[6] She explained she "felt forced into making that video" and "was still scared that they might be able to find me anywhere I go."[7] She described similar pressure to write the pretrial letter: "I didn't really feel like I had a choice so I sat down and wrote saying I knew the accusations were not true like my stepmom said."[8]

¶19 Eleven days after receiving the recordings from the jail and nine days after L.P.'s declaration, Detective Johnson disclosed to the prosecutor that he had listened to calls between Peña Fuentes and attorney Hansen. He did not reveal the content of their conversations. The prosecutor instructed the detective not to listen to any further calls, not to tell anyone about the substance of the calls, and to withdraw immediately from the witness tampering investigation.

---

[6] Clerk's Papers at 214.

[7] *Id.*

[8] *Id.*

¶20 Informed by the prosecutor of the detective's actions, defense counsel swiftly filed a motion to dismiss for governmental misconduct under CrR 8.3. The prosecutor attested he had never listened to the recordings or been informed of their substance, and that he had "not relied on any information that may be contained in the calls between Mr. Hansen and the defendant for any purpose, including trial preparation or the [response to] defendant's motion for a new trial."[9]

¶21 After argument on the pending motions, the trial court denied both the motion for a new trial based on newly discovered evidence and also denied the motion to dismiss for governmental misconduct.

¶22 Peña Fuentes appeals. The Washington Association of Criminal Defense Lawyers filed an amicus curiae brief in this appeal.[10]

## DISCUSSION

### Government Misconduct

¶23 Under CrR 8.3(b), a court may dismiss a prosecution when government misconduct causes "prejudice to the rights of the accused which materially affect the accused's right to a fair trial." Dismissal under CrR 8.3 is "an extraordinary remedy, one to which a trial court should turn only as a last resort."[11] To justify dismissal on this basis, "the defendant must show actual prejudice; the mere possibility of prejudice is insufficient."[12] We review the trial court's decision for manifest abuse of discretion.[13]

---

[9] Clerk's Papers at 220.

[10] We discuss the State's cross appeal in the unpublished portion of this opinion.

[11] *State v. Wilson*, 149 Wn.2d 1, 12, 65 P.3d 657 (2003).

[12] *State v. Krenik*, 156 Wn. App. 314, 320, 231 P.3d 252 (2010).

[13] *State v. Blackwell*, 120 Wn.2d 822, 830, 845 P.2d 1017 (1993).

■ ¶24 Peña Fuentes contends that prejudice must be presumed whenever police eavesdrop on attorney-client conversations and that dismissal is the only appropriate remedy.[14] Where intrusion upon the attorney-client relationship is purposeful and without justification, prejudice may be presumed.[15] Detective Johnson knowingly listened to six separate conversations between defendant and his counsel. He lacked any conceivable justification. This is egregious misconduct and gives rise to a presumption of prejudice.

¶25 Even where prejudice is presumed, however, dismissal is not automatic. In *State v. Granacki*, for example, a detective read some of defense counsel's notes during a trial recess.[16] The notes reflected trial strategy and confidential communications with the defendant. Although the detective did not tell the prosecutor what he had seen, the trial court dismissed the charges. We affirmed, noting that "dismissal not only affords the defendant an adequate remedy but discourages 'the odious practice of eavesdropping on privileged communication between attorney and client.' "[17] But we also observed that dismissal was not the only permissible remedy:

> Normally misconduct does not require dismissal absent actual prejudice to the defendant. Even then, the court may properly

---

[14] The United States Supreme Court rejects the premise that " 'whenever the prosecution knowingly arranges or permits intrusion into the attorney-client relationship the right to counsel is sufficiently endangered to require reversal and a new trial.' " *Weatherford v. Bursey*, 429 U.S. 545, 549, 97 S. Ct. 837, 51 L. Ed. 2d 30 (1977) (quoting *Bursey v. Weatherford*, 528 F.2d 483 (4th Cir. 1975)). *Bursey* involved an undercover officer who was arrested with the defendant and later, still undercover, participated in discussions with Bursey and his counsel. He never disclosed these discussions to the prosecutor, but his role was later revealed. The court held that because there was "no tainted evidence . . . , no communication of defense strategy to the prosecution, and no purposeful intrusion . . . , there was no violation of the Sixth Amendment." *Id.* at 558.

[15] *See State v Garza*, 99 Wn. App. 291, 300-01, 994 P.2d 868 (2000) (jail officers' search for, confiscation of, and perusal of inmates' legal documents justified a presumption of prejudice).

[16] 90 Wn. App. 598, 600, 959 P.2d 667 (1998).

[17] *Id.* at 603 (quoting *State v. Cory*, 62 Wn.2d 371, 378, 382 P.2d 1019 (1963)).

choose to impose a lesser sanction because this is a classic example of trial court discretion. Had the court chosen to ban Detective Kelly from the courtroom, exclude his testimony and prohibit him from discussing the case with anyone, we would not find an abuse of discretion. But, based on the trial judge's evaluation of all the circumstances and Detective Kelly's credibility, the sanction he imposed was also within his discretion.[18]

¶26 Peña Fuentes relies upon *State v. Cory*[19] and *State v. Perrow*.[20] Both cases involve situations in which the intrusion on the attorney-client relationship occurred before and/or during trial, leaving the court with no way to isolate the resulting prejudice.

¶27 In *Cory*, sheriff's officers used a microphone to eavesdrop on the defendant's conversations with counsel "from the time of his arrest throughout trial and thereafter."[21] Reasoning that "[t]here is no way to isolate the prejudice" from such eavesdropping, our Supreme Court held that the only adequate remedy was to vacate the convictions and dismiss the charges.[22]

¶28 In *Perrow*, a detective executing a search warrant seized the defendant's writings.[23] Despite knowing the documents were prepared for the defendant's attorney, the detective examined and copied the documents and delivered them to the prosecutor, who later filed charges.[24] Division Three of this court held that "[a]s in *Cory*, it is impossible to isolate the prejudice presumed from the

---

[18] *Id.* at 604 (citation omitted).

[19] 62 Wn.2d 371, 382 P.2d 1019 (1963).

[20] 156 Wn. App. 322, 231 P.3d 853 (2010).

[21] *Cory*, 62 Wn.2d at 372.

[22] *Id.* at 377.

[23] *Perrow*, 156 Wn. App. at 325.

[24] *Id.* at 326.

attorney-client privilege violation" and that the trial court did not abuse its discretion by dismissing the charges.[25]

¶29 In this case, however, it is possible to isolate the potential prejudice resulting from the intrusion. The detective's odious conduct had no effect on the fairness of the trial itself because it occurred afterward. Any prejudice therefore occurred during the posttrial motions proceedings.

¶30 Three grounds were asserted for new trial. Two were strictly legal: the double jeopardy argument and the alleged evidentiary error. Johnson's misconduct could not have affected the rulings on those issues. The third ground, however, was premised on the videotape offered as newly discovered evidence. The State's response to that motion consisted of L.P.'s declaration disavowing the video, which Johnson apparently helped the prosecutor obtain and which was signed two days after Johnson received the recordings.[26] The content of the declaration is thus the only point of possible prejudice resulting from Johnson's misconduct.

¶31 The trial court found the videotape itself not credible and disregarded L.P.'s declaration recanting it. The court therefore concluded that the detective's intrusion upon Peña Fuentes' right to counsel could not have caused prejudice to Peña Fuentes *on these charges.*[27] Under these circumstances, the presumption of prejudice was rebutted.

¶32 This is a very unusual situation. Deliberate intrusion upon the attorney-client relationship by a police officer cries out for a strong judicial response—such as dismissal of all charges—as a means of discouraging such "odious prac-

---

[25] *Id.* at 332.

[26] It is unclear exactly when Johnson listened to the tapes.

[27] Had the State pursued charges for witness tampering, it would be an entirely different matter.

tices."[28] But it is nonetheless true that by happenstance, Johnson's egregious misconduct did not actually cause prejudice to Peña Fuentes.

¶33 It is also true that the appropriate remedy is left to the court's discretion.[29] As offensive and unscrupulous as the detective's actions were, they occurred after the trial and did not affect the posttrial proceedings. The court did not abuse its discretion in refusing to dismiss the charges already tried.

¶34 Affirmed.

¶35 The balance of this opinion having no precedential value, the panel has determined it should not be published in accordance with RCW 2.06.040.

Cox, J., concurs.


¶36 BECKER, J. (dissenting) — I agree with the majority that Detective Johnson's decision to listen to the telephone calls between the defendant and defense counsel was inexcusable, astonishing, egregious, and odious. I do not agree that it is possible to isolate the prejudice arising from the misconduct. A motion for a new trial was pending that had a reasonable chance of securing a new trial for the defendant, depending upon how the trial court evaluated the new evidence obtained in the videotaped interview. After listening to the phone calls of defense counsel discussing strategy with his client, Detective Johnson spent 11 days actively working to discredit the videotaped interview.

¶37 We are instructed by *State v. Cory*, 62 Wn.2d 371, 382 P.2d 1019 (1963), that the right to have the assistance of counsel is so fundamental and absolute that we should not indulge in nice calculations as to the amount of prejudice resulting from its denial. Here, it is too nice a calcula-

---

[28] *Granacki*, 90 Wn. App. at 603.

[29] *Id.* at 604.

tion to say that the conviction itself was not tainted. In my view, this case is controlled by *Cory* and should have the same result: dismissal of all charges with prejudice.

¶38 I also dissent from the majority's decision on the State's cross appeal. As explained in the unpublished portion of the opinion, the trial court struck the conviction on count 1 after finding a double jeopardy violation. The majority reinstates the conviction, concluding that child molestation and child rape can never be the same offense. I disagree. Circumstances in which the two offenses are the same in fact and in law are discussed in *State v. Land*, 172 Wn. App. 593, 295 P.3d 782 (2013). There should have been an instruction requiring the jury to base convictions for child rape and child molestation on separate and distinct acts. *Land*, 172 Wn. App. at 603; *State v. Mutch*, 171 Wn.2d 646, 661-65, 254 P.3d 803 (2011); *State v. Borsheim*, 140 Wn. App. 357, 165 P.3d 417 (2007). Because no such instruction was given and the record does not clearly demonstrate that the State was not seeking to punish Peña Fuentes twice for the same offense, I would affirm the trial court's finding of a double jeopardy violation.

Review granted at 177 Wn.2d 1008 (2013).