2013 JUN 24 AM 11:00

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | NO. 66858-7-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| PHONSAVANH PHONGMANIVAN, | ) | |
| | ) | |
| Appellant. | ) | FILED: June 24, 2013 |
| | ) | |

LEACH, C.J. — Phonsavanh (Sam) Phongmanivan appeals his conviction for first degree assault. He argues that the trial court violated his due process rights by permitting a severely disabled victim to testify without first requiring a full forensic neuropsychological examination to assess her competency to testify. He also claims that the court improperly denied his motion to dismiss for prosecutorial misconduct. Because the court did not abuse its discretion on either ruling, we affirm.

## FACTS

On October 31, 2008, Margilynn Umali and her boyfriend, Phonsavanh Phongmanivan, celebrated Halloween with several friends in the Belltown neighborhood of Seattle. As they walked through Belltown, two men started flirting with Umali, and a fight broke out. Someone fired a gun, shooting Umali in

the head. Phongmanivan and another man carried Umali to the car and took her to the hospital. Umali survived the shooting, but a bullet remained lodged in her brain, causing her to suffer from severe aphasia.[1] Another victim, Roger Wright, suffered gunshot wounds to his leg and buttocks.

The State charged Phongmanivan with the shootings. As Umali recovered and began to regain her ability to speak, the State decided to call her as a witness at trial. Phongmanivan questioned her ability to testify and submit to meaningful cross-examination. The court held a competency hearing, at which Umali testified, using a combination of oral and written responses, drawings, and gestures to respond to questions. When asked about what happened the night of the shooting, she drew a picture of Phongmanivan holding the gun. At the end of the hearing, the court remarked, "[C]ertainly this is the most profoundly disabled adult I've ever seen on the stand where testimony is being offered from that witness," but he ultimately found Umali competent to testify.

Before trial, Phongmanivan renewed his objection to Umali's testimony and moved to compel a forensic psychological exam to determine her competency and if the memories she professed were real or manufactured.

---

[1] "Aphasia" is defined as "'[a]ny of a large group of speech disorders involving defect or loss of the power of expression by speech, writing or signs, or of comprehending spoken or written language, due to injury or disease of the brain or to psychogenic causes.'" Payne v. Astrue, No. 4:11-CV-01113, 2012 WL 5389705, at *5 n.16 (M.D. Pa. Nov. 2, 2012) (alteration in original) (quoting DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 114 (32d ed. 2012)).

Phongmanivan's expert questioned whether Umali understood the events surrounding the assault and the trial proceedings, but he admitted that no available test could determine whether her memories were real or not. The court denied the motion, and the case proceeded to trial.

At trial, both victims, Umali and Wright, testified that Phongmanivan was the shooter. A third witness, who videotaped the entire scene, could not identify Phongmanivan as the shooter but stated that one of the men who carried Umali to the car was the shooter. The defense stipulated that Phongmanivan and another person carried Umali to the car and that the other person who carried her to the car was not a suspect. Several other witnesses testified that the shooter was an Asian male with short hair wearing a Seattle Seahawks jersey. Phongmanivan indicated that Gabriel McBride fit that description.

McBride and his girl friend, Janelle Dalit, were at the scene of the shooting and were friends with Roger Wright. Although Detective Eugene Ramirez conducted a full interview with Dalit a few days after the shooting, he was unable to locate or speak with McBride. By the time of trial, Detective Ramirez could no longer locate Dalit because she moved and changed phone numbers. Originally, the prosecutor did not expect to call Dalit and McBride as witnesses.

The day before trial, the prosecutor had contact with Dalit for the first time. She stated that she did not respond to the prosecution's repeated attempts to

locate her because she did not want to be involved in the case. The prosecutor informed Dalit of the defense's planned case strategy to convince her and McBride to testify.

On December 7, 2010, Phongmanivan interviewed Dalit and learned that the prosecutor had met with Dalit and McBride and informed them that the defense intended to blame McBride for the crime. Phongmanivan moved to dismiss based on the prosecutor's violation of a witness exclusion order. Although the trial court found the prosecutor's conduct inappropriate, it denied the motion. Instead, the court allowed Phongmanivan to cross-examine Dalit and McBride on anything that the prosecutor told them.

Dalit testified that she was with McBride at the time of the shooting, but she could not identify the shooter. She also testified that nothing in her statement to Detective Ramirez a few days after the shooting was any different from her trial testimony or defense interview. On cross-examination, Dalit admitted that she only learned Phongmanivan identified McBride as the shooter when the prosecutor told her.

On December 8, 2010, the defense interviewed McBride. McBride reported that he first learned about the State's efforts to locate him when Dalit told him about testifying and discussed her memory of the events with him. Phongmanivan renewed his motion to dismiss under CrR 8.3(b) for governmental

-4-

misconduct. The court denied the motion, finding insufficient evidence to support dismissal of the case for prosecutorial misconduct. The court noted that due to possible Fifth Amendment concerns, the prosecutor was entitled to, if not ethically required to, inform McBride of Phongmanivan's allegation that McBride was the perpetrator. The court also ruled that Phongmanivan had not shown any prejudice.

The jury convicted Phongmanivan of two counts of first degree assault with firearm enhancements. The court imposed a standard range sentence of 306 months in prison. Phongmanivan appeals.

## STANDARD OF REVIEW

This court reviews a trial court's decision about a witness's competence to testify for an abuse of discretion.[2] It also reviews a trial court's CrR 8.3(b) decision for an abuse of discretion. A trial court abuses its discretion when its decision is manifestly unreasonable or is based on untenable grounds.[3] "A trial court's decision is manifestly unreasonable if it 'adopts a view that no reasonable person would take.'"[4] A trial court bases its decision on untenable grounds or

---

[2] State v. Stange, 53 Wn. App. 638, 642, 769 P.2d 873 (1989).

[3] In re Det. of Duncan, 167 Wn.2d 398, 402, 219 P.3d 666 (2009).

[4] Duncan, 167 Wn.2d at 402-03 (internal quotation marks omitted) (quoting Mayer v. Sto Indus., Inc., 156 Wn.2d 677, 684, 132 P.3d 115 (2006)).

untenable reasons if it applies the wrong legal standard or relies on unsupported facts.[5]

## ANALYSIS

Phongmanivan alleges that the trial court erred by finding Umali competent to testify and by denying his motion to conduct a forensic evaluation to determine her exact cognitive abilities. A court will hold a witness competent if the witness understands the nature of the oath and is capable of giving a correct account of what he or she has seen and heard.[6] Washington courts presume the competency of every witness to testify.[7] Any witness not able to receive just impressions of the facts or to relate them truly is not competent to testify.[8] This prohibition applies "only to those with no comprehension at all, not to those with merely limited comprehension"[9] and to those with an "inability to distinguish between right and wrong."[10] The party challenging the competency of a witness has the burden of rebutting the presumption.[11]

---

[5] Duncan, 167 Wn.2d at 403.

[6] State v. Allen, 67 Wn.2d 238, 241, 406 P.2d 950 (1965).

[7] State v. S.J.W., 170 Wn.2d 92, 100, 239 P.3d 568 (2010); RCW 5.60.020 ("Every person of sound mind and discretion . . . may be a witness in any action, or proceeding."); CrR 6.12(a) ("Any person may be a witness in any action or proceeding under these rules except as hereinafter provided or as provided in the Rules of Evidence.").

[8] RCW 5.60.050.

[9] State v. Watkins, 71 Wn. App. 164, 169, 857 P.2d 300 (1993).

[10] State v. Smith, 97 Wn.2d 801, 803, 650 P.2d 201 (1982).

[11] S.J.W., 170 Wn.2d at 102.

Specifically, Phongmanivan questions Umali's ability to accurately recall events and report information about the night of the shooting. The court addressed these issues at a competency hearing on March 10, 2010. Umali testified using a combination of verbal and written responses and by drawing pictures in response to some questions. Despite her difficulty communicating, the court ultimately found that Umali understood the difference between right and wrong and that she appeared to have some memory of the shooting. The court held her competent to testify at trial.

Before trial, Phongmanivan renewed his motion and asked the court to order a full forensic psychological evaluation of Umali before allowing her to testify. He acknowledged that the primary purpose of the exam was to determine if Umali's memories of the shooting were real or whether they had been "fed" to her by her family and other people involved in the case. However, Phongmanivan's psychology expert conceded that no psychological test could provide the answer to this question.

Phongmanivan argues that State v. Mines[12] permits the court, in compelling circumstances, to order a witness to undergo a forensic examination. He acknowledges that Mines actually held that the trial court did not abuse its

---

[12] 35 Wn. App. 932, 935-36, 671 P.2d 273 (1983).

discretion when it refused to appoint an expert witness but asserts that the case recognizes one should be appointed in appropriate circumstances.

The State agrees the trial court had discretion to require a psychological examination upon a showing of a compelling reason but contends Phongmanivan failed to make the required showing. The State also contends Phongmanivan did not establish that Umali lacked the ability to tell right from wrong or some ability to observe and recall the events in issue. It also notes that Phongmanivan conceded the unavailability of any test to measure his true concern—that Umali's memory was not real and was created by others. Finally, the State points to the cross-examination of Umali and the medical experts to show that Phongmanivan had sufficient opportunity to demonstrate to the jury his challenges to her testimony.

The trial court had the opportunity to evaluate Umali's testimony and demeanor. The court found that "she's making her best attempt to testify from memory and she has some memories, or at least she states that she has some memories." The court also noted that how those memories

> [a]re put into evidence is difficult and how the cross examination will proceed is also difficult. But that is not the legal issue before the court.
> . . . .
> . . . The only issue for me today is whether there's some memory she has that she can recount.

Phongmanivan presented only assertions and not evidence that Umali completely lacked the ability to comprehend events. The evidence demonstrated only that her comprehension was incomplete. On these facts, we cannot say that the trial court abused its discretion by finding Umali competent to testify and by refusing to order a full forensic examination.

Further, the defense received more than ten volumes of Umali's medical records through discovery. At trial, Phongmanivan was able to cross-examine Umali and clearly demonstrate to the jury how she had difficulty processing information. He also cross-examined Umali's doctors at length, including her speech pathologist and several rehabilitation specialists. Given all the information presented about Umali's condition during the trial, the jury was in the best position to gauge her reliability as a witness and, as with any witness, give her testimony the weight it deserved.

The trial court did not abuse its discretion by finding Umali competent to testify without requiring forensic testing, and her testimony did not deny Phongmanivan a fair trial.

Phongmanivan next contends that the trial court erred by denying his motion to dismiss for governmental misconduct under CrR 8.3(b).[13] He argues

---

[13] CrR 8.3(b) states, "The court, in the furtherance of justice, after notice and hearing, may dismiss any criminal prosecution due to arbitrary action or governmental misconduct when there has been prejudice to the rights of the accused which materially affect the accused's right to a fair trial."

that the prosecutor violated the witness sequestration order by speaking with two witnesses about the defense's trial strategy to induce them to testify and that this violation denied him a fair trial.

Dismissal under CrR 8.3 is "an extraordinary remedy, one to which a trial court should turn only as a last resort."[14] To support dismissal under CrR 8.3(b), the defendant must show by a preponderance of evidence both (1) arbitrary action or misconduct and (2) actual prejudice affecting the defendant's right to a fair trial.[15] While claimed governmental misconduct need not be evil or dishonest in nature,[16] dismissal will be granted only where there is actual prejudice to the rights of the accused.[17] Thus, the State's failure to sequester witnesses does not require a new trial unless the court's decision to allow the allegedly tainted testimony resulted in actual prejudice.[18] For alleged misconduct to create prejudice, the acts must materially affect the defendant's right to a fair trial.[19] The mere possibility of prejudice is insufficient.[20]

---

[14] State v. Wilson, 149 Wn.2d 1, 12, 65 P.3d 657 (2003).
[15] State v. Wilson, 108 Wn. App. 774, 777, 31 P.3d 43 (2001).
[16] State v. Michielli, 132 Wn.2d 229, 239, 937 P.2d 587 (1997).
[17] State v. Moen, 150 Wn.2d 221, 226, 76 P.3d 721 (2003).
[18] State v. Adams, 76 Wn.2d 650, 659, 458 P.2d 558 (1969), reversed on other grounds by Adams v. Washington, 403 U.S. 947, 91 S. Ct. 2273, 29 L. Ed. 2d 855 (1971).
[19] State v. Pena Fuentes, 172 Wn. App. 755, 761, 295 P.3d 252 (2013), petition for review filed, No. 88422-6 (Wash. Feb. 12, 2013).
[20] State v. Krenik, 156 Wn. App. 314, 320, 231 P.3d 252 (2010).

Assuming, without finding, that the prosecutor's actions were improper, we find no prejudice. Phongmanivan contends that we should presume prejudice based on the prosecutor's knowing violation of the witness sequestration order. Phongmanivan asks this court to shift the burden to the State to prove the absence of prejudice. He cites United States v. Ell,[21] a Ninth Circuit Court of Appeals case holding that when a prosecutor violates a witness sequestration order, the court presumes prejudice, requiring reversal unless the prosecution proves harmless error by a preponderance of the evidence. His reliance on Ell, however, is misplaced. Ell addressed the court's refusal to exclude witnesses pursuant to the Federal Rules of Evidence. Under Fed. R. Evid. 615, "[a]t a party's request, the court must order witnesses excluded so that they cannot hear other witnesses' testimony." In contrast, Washington trial courts have discretion whether to sequester witnesses.[22]

Allowing Dalit and McBride to testify did not affect the fairness of Phongmanivan's trial. When the prosecutor contacted Dalit, no witnesses had testified, and the defense had not presented its opening statement. While the prosecutor's contact with McBride occurred after testimony had begun, the prosecutor limited her statements to the nature of the case and did not discuss the other witnesses' testimony. Further, Dalit testified consistently with a

---

[21] 718 F.2d 291, 293-94 (9th Cir. 1983).
[22] ER 615; Adams, 76 Wn.2d at 659.

statement she gave the police shortly after the shooting and her defense interview. She did not identify the shooter, and Phongmanivan defended based on mistaken identity. Phongmanivan has not shown that the prosecutor's actions affected any testimony presented to the jury.

Phongmanivan argues in the alternative that the trial court erred by allowing Dalit and McBride to testify. He argues that the weight of Dalit's testimony was considerably affected by the fact that the prosecutor informed her of the defense theory and that Dalit was called especially to corroborate McBride's alibi.

The remedy for violating a witness exclusionary order is at the trial judge's discretion.[23] Washington recognizes three possible sanctions when a party violates such an order: "(1) hold the witness in contempt, (2) allow cross-examination regarding the violation and/or comments about the witness's actions during closing argument, or (3) preclude the witness from testifying."[24] Several decisions have upheld a trial court's decision to allow witnesses to testify despite violating an exclusionary order.[25] The trial court provided an appropriate remedy in this case. The judge allowed full cross-examination of Dalit and McBride

---

[23] State v. Skuza, 156 Wn. App. 886, 896, 235 P.3d 842 (2010), review denied, 170 Wn.2d 1021, 245 P.3d 775 (2011).

[24] Skuza, 156 Wn. App. at 896.

[25] See State v. Dixon, 37 Wn. App. 867, 877, 684 P.2d 725 (1984); State v. Schapiro, 28 Wn. App. 860, 867-68, 626 P.2d 546 (1981); State v. Walker, 19 Wn. App. 881, 883, 578 P.2d 83 (1978).

regarding anything that the prosecutor told them about the case. The information elicited through this cross-examination allowed the jury to question the prosecutor's and the witnesses' credibility.

Lastly, Phongmanivan argues that the prosecutor's violation of the sequestration order and the trial court's subsequent failure to exclude the testimony rendered the trial so fundamentally unfair as to violate his due process right under the Fourteenth Amendment.[26] Dismissal based on outrageous conduct requires more than a mere demonstration of flagrant conduct.[27] The level of governmental misconduct must shock the conscience of the court and the universal sense of fairness.[28] The due process clause of the Washington Constitution does not afford broader protection than that of the Fourteenth Amendment.[29]

In Larson v. Palmateer,[30] the Ninth Circuit Court of Appeals held that failure to exclude a witness does not violate a defendant's due process rights. Responding to the defendant's claim that the trial court's failure to exclude witnesses violated his right to due process, the court stated,

---

[26] Constitutional error may be raised for the first time on appeal. RAP 2.5(a)(3); State v. Johnson, 100 Wn.2d 607, 614, 674 P.2d 145 (1983), overruled on other grounds by State v. Bergeron, 105 Wn.2d 1, 711 P.2d 1000 (1985).

[27] State v. Lively, 130 Wn.2d 1, 20, 921 P.2d 1035 (1996).

[28] Lively, 130 Wn.2d at 19.

[29] State v. McCormick, 166 Wn.2d 689, 699, 213 P.3d 32 (2009).

[30] 515 F.3d 1057, 1065 (9th Cir. 2008).

NO. 66858-7-I / 14

> Neither this court nor the Supreme Court has ever held that the failure to exclude witnesses can violate due process. . . . Although the Federal Rules of Evidence now require a federal district court to exclude witnesses upon the motion of a party, there is no indication that this rule has a constitutional basis.[31]

Phongmanivan makes no showing that the prosecutor's contact with Dalit and McBride adversely affected his trial. As the trial court concluded, the record does not suggest that Dalit and McBride tailored their testimony to corroborate the testimony of other witnesses. Rather, their testimonies were limited to the events of the shooting, not the shooter's identity. Because the trial court provided an appropriate remedy for any improper communication between the prosecutor and these witnesses, no due process violation occurred.

## CONCLUSION

Because the court did not abuse its discretion by denying Phongmanivan's motion for a forensic evaluation of Umali or his motion to dismiss, we affirm.

_Leach, C. J._

WE CONCUR:

_Spearman, J._          _Becker, J._

---

[31] Palmateer, 515 F.3d at 1065.